1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Angela D Masterson,                    No. CV-23-01848-PHX-DWL

10                    Plaintiff,             **ORDER**

11   v.

12   Commissioner    of   Social   Security
     Administration,

13
                     Defendant.
14

15          Plaintiff challenges the denial of her application for benefits under the Social

16   Security Act ("the Act") by the Commissioner of the Social Security Administration

17   ("Commissioner").  The Court has reviewed Plaintiff's opening brief (Doc. 13), the

18   Commissioner's answering brief (Doc. 17), and Plaintiff's reply (Doc. 18), as well as the

19   Administrative Record (Docs. 8-10, "AR"), and now reverses the Administrative Law

20   Judge's ("ALJ") decision and remands for further proceedings.

21   I.     Procedural History

22          Plaintiff filed an application for benefits on February 15, 2021, alleging disability

23   beginning on January 7, 2021.  (AR at 17.)[1]  The Social Security Administration ("SSA")

24   denied Plaintiff's application at the initial and reconsideration levels.  (*Id.*)  On March 29,

25   2023, following a video hearing, the ALJ issued an unfavorable decision.  (*Id.* at 17-35.)

26   _____

27   [1]      On January 7, 2021, an ALJ denied an earlier application for disability benefits filed
     by Plaintiff.  (AR at 104-14.)  Such a denial gives rise to a presumption of continuing non-
     disability on a subsequent application unless the claimant can show changed circumstances
28   indicating a greater disability.  *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988).  The
     ALJ concluded that Plaintiff made such a showing here.  (AR at 18.)

1    The Appeals Council later denied review.  (*Id.* at 1-3.)

2    II.    The Sequential Evaluation Process and Judicial Review

3    To determine whether a claimant is disabled for purposes of the Act, the ALJ

4    follows a five-step process.  20 C.F.R. § 416.920(a).  The claimant bears the burden of

5    proof at the first four steps, but the burden shifts to the Commissioner at step five.  *Tackett*

6    *v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  At the first step, the ALJ determines whether

7    the claimant has engaged in substantial, gainful work activity.  20 C.F.R.

8    § 416.920(a)(4)(i).  At step two, the ALJ determines whether the claimant has a "severe"

9    medically determinable physical or mental impairment.  *Id*. § 416.920(a)(4)(ii).  At step

10    three, the ALJ considers whether the claimant's impairment or combination of impairments

11    meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R.

12    Part 404.  *Id*. § 416.920(a)(4)(iii).  If so, the claimant is disabled.  *Id.*  If not, the ALJ

13    assesses the claimant's residual functional capacity ("RFC") and proceeds to step four,

14    where the ALJ determines whether the claimant is still capable of performing past relevant

15    work.  *Id*. § 416.920(a)(4)(iv).  If not, the ALJ proceeds to the fifth and final step, where

16    the ALJ determines whether the claimant can perform any other work in the national

17    economy based on the claimant's RFC, age, education, and work experience.  *Id*.

18    § 416.920(a)(4)(v).  If not, the claimant is disabled.  *Id.*

19    "On judicial review, an ALJ's factual findings . . . shall be conclusive if supported

20    by substantial evidence."  *Biestek v. Berryhill*, 587 U.S. 97, 102  (2019) (cleaned up).  The

21    Court may set aside the Commissioner's disability determination only if it is not supported

22    by substantial evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th

23    Cir. 2007).  Substantial evidence is relevant evidence that a reasonable person might accept

24    as adequate to support a conclusion considering the record as a whole.  *Id.*  Generally,

25    "[w]here the evidence is susceptible to more than one rational interpretation, one of which

26    supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*,

27    278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).  In deciding whether to reverse an

28    ALJ's decision, the district court reviews only those issues raised by the party challenging

1    the decision.  *Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).

2    III.    The ALJ's Decision

3           The ALJ concluded that Plaintiff had not engaged in substantial, gainful work

4    activity since the alleged onset date and that Plaintiff had the following severe impairments:

5    "degenerative changes of the spine; rheumatoid arthritis; idiopathic neuropathy; mild

6    carpal tunnel syndrome; headaches; obesity; anxiety; depression; and post-traumatic stress

7    disorder (PTSD)."  (AR at 20.)[2]  Next, the ALJ concluded that Plaintiff's impairments did

8    not meet or medically equal a listing.  (*Id.* at 20-23.)  Next, the ALJ calculated Plaintiff's

9    RFC as follows:

> [T]he claimant had the residual functional capacity (RFC) to perform light
> work as defined in 20 CFR 404.1567(b).  She could lift/carry 20 pounds
> occasionally and ten pounds frequently; sit for six hours in an eight-hour day
> and stand/walk for six hours in an eight-hour day; she should never climb
> ropes, ladders or scaffolds or crawl; she could frequently balance; she could
> occasionally climb ramps and stairs, stoop, kneel, and crouch; she should
> avoid concentrated exposure to temperature extremes, loud noise,
> unprotected heights, and moving and dangerous machinery; she could
> frequently perform fingering bilaterally; she was able to understand,
> remember, and carry out simple instructions and tasks; she could respond
> appropriately to supervisors and co-workers in a task-oriented setting where
> contact with others was no more than occasional; and she should not work in
> a setting that included constant/regular public contact or more than
> occasional handling of customer complaints.

20   (*Id.* at 23.)

21          As part of this RFC determination, the ALJ evaluated Plaintiff's symptom

22   testimony, concluding that Plaintiff's "statements concerning the intensity, persistence and

23   limiting effects of [her] symptoms were not entirely consistent with the medical evidence

24   and other evidence in the record for the reasons explained in this decision."  (*Id.* at 23-28.)[3]

26   [2]     The ALJ also determined that Plaintiff had the non-severe impairments of "mild
degenerative changes of the left ankle, GERD/heartburn/acid reflux, and anemia" and that
27   although Plaintiff "allege[d] fibromyalgia," it "was not a medically determinable
impairment."  (AR at 20.)
28   [3]     Plaintiff does not challenge, in this appeal, the ALJ's decision to discredit her
symptom testimony.

The ALJ also evaluated opinion evidence from 11 different medical sources, concluding as follows: (1) Andrew Sharobeem, D.O., treating rheumatologist ("not persuasive"); (2) Michael Albertson, PA-C, treating source ("unpersuasive"); (3) James Beach, D.O., treating physician ("not persuasive"); (4) Dr. Gordon, consultative examiner ("only partially persuasive"); (5) Dr. Andersen, consultative examiner ("partially persuasive"); (6) Dr. Farrah Hauke, consultative examiner ("persuasive"); (7) Nadine Apostu, PA-C, treating source ("unpersuasive"); (8) Dane Higgins, Ph.D., independent neuropsychological examiner ("otherwise minimally persuasive"); (9) Rosalia Pereyra, Psy.D., state agency consultant ("persuasive"); (10) George W. Stern, Ph.D., state agency consultant ("not persuasive"); (11) Gary Smith, M.D., state agency consultant ("less persuasive"); and (11) Robert Hughes, M.D., state agency consultant ("persuasive").  (*Id.* at 28-32.)

Based on the testimony of a vocational expert ("VE"), the ALJ concluded that although Plaintiff could not perform her past relevant work as a phlebotomist, she is capable of performing three other jobs that exist in significant numbers in the national economy: (1) cleaner, (2) marker, and (3) router.  (*Id.* at 32-33.)  Thus, the ALJ concluded that Plaintiff is not disabled.  (*Id.* at 33-34.)

IV.  <u>Discussion</u>

Plaintiff raises three issues on appeal: (1) whether the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Dr. Andersen; (2) whether the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Dr. Huggins; and (3) whether the ALJ failed to provide legally sufficient reasons for rejecting the opinions of PA-C Albertson.  (Doc. 13 at 1.)  As a remedy, Plaintiff seeks a "[r]emand for calculation of benefits. . . .  Only in the alternative should this Court remand for further administrative proceedings."  (*Id.* at 25.)

…

…

…

- 4 -

A.    **Dr. Andersen**

1.    Standard Of Review

In January 2017, the SSA amended the regulations concerning the evaluation of medical opinion evidence. *See Revisions to Rules Regarding Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations apply to applications filed on or after March 27, 2017, and are therefore applicable here. The new regulations provide in relevant part as follows:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. . . . The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability . . . and consistency . . . .

20 C.F.R. § 416.920c(a). Regarding the "supportability" factor, the new regulations explain that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), . . . the more persuasive the medical opinions . . . will be." *Id.* § 404.1520c(c)(1). Regarding the "consistency" factor, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2).[4]

The Ninth Circuit has confirmed that the "recent changes to the Social Security Administration's regulations displace our longstanding case law requiring an ALJ to provide 'specific and legitimate' reasons for rejecting an examining doctor's opinion." *Woods v. Kijakazi*, 32 F.4th 785, 787 (9th Cir. 2022). Thus, "the former hierarchy of medical opinions—in which we assign presumptive weight based on the extent of the doctor's relationship with the claimant—no longer applies. Now, an ALJ's decision,

---

[4]    Other factors that may be considered by the ALJ in addition to supportability and consistency include the provider's relationship with the claimant, the length of the treatment relationship, the frequency of examinations, the purpose and extent of the treatment relationship, and the specialization of the provider. *Id.* § 416.920c(c).

including the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id.* With that said, "[e]ven under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence. The agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Id.* at 792 (cleaned up). Although "an ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records. . . . [t]he ALJ no longer needs to make specific findings regarding these relationship factors . . . ." *Id.* (citation omitted).

## 2.   Dr. Andersen's Opinions

On December 17, 2021, Dr. Andersen performed a psychiatric examination of Plaintiff. (AR at 1184.) Afterward, Dr. Andersen issued a report entitled "Psychological Report." (*Id.* at 1184-89.) In the report, Dr. Andersen began by summarizing the records he had reviewed; Plaintiff's chief complaints; Plaintiff's history of mental health issues; Plaintiff's treatment, occupational, cultural, educational, social, and medical history; Plaintiff's activities of daily living; and Plaintiff's criminal and substance abuse history. (*Id.* at 1184-87.) Next, Dr. Andersen described his observations of Plaintiff during the examination. (*Id.* at 1187.) Next, Dr. Andersen summarized the results of a mini-mental status examination ("MMSE") he administered. (*Id.* at 1187-88.) Next, Dr. Andersen provided a diagnostic summary. (*Id.* at 1188.) Finally, under the headings "Prognosis" and "Capability," Dr. Andersen wrote:

> Her condition is considered to be chronic. She is being treated with medication and psychotherapy for her mood; however, she continues having significant emotional symptoms (e.g., crying spells on a nearly daily basis). She is not capable of handling awarded benefits in a responsible manner that would be in her best interest. Specifically, she lacks task initiation, and I would be concerned with her ability to pay bills on-time (as she even lacks

motivation to eat as evidenced by eating only 1 meal per day) and the organizational aspect of managing her finances.

(*Id.* at 1188-89.)

Separately, Dr. Anderson completed a form entitled "Psychological/Psychiatric Medical Source Statement" in which he evaluated Plaintiff's functional capacity in four areas. (*Id.* at 1190-91.) First, as for "Understanding and Memory," Dr. Andersen wrote: "Ms. Masterson's remote history appears intact; however, she was able to recall only 2 of 3 words following a brief distraction on the MMSE. Short term memory problems (i.e., the ability to remember work-like instructions) are common in individuals with bipolar disorder and PTSD, both of which Ms. Masterson's has. She is likely prone to forgetfulness and making mistakes due to her pronounced emotional symptoms. Otherwise, she appears to have the ability to remember instruction." (*Id.* at 1190.) Second, as for "Sustained Concentration and Persistence," Dr. Andersen wrote: "Ms. Masterson's attention/concentration will likely be fleeting in conjunction with her emotional symptoms. There was no evidence of attention/concentration problems during the exam; however, the psychological exam took place in a relaxed, relatively distraction-free environment. In a stressful or distracting environment, she is prone to concentration problems. In addition, she lacks task initiation, which is common in depressed individuals, and I would be concerned with her ability to consistently carry out tasks without any oversight." (*Id.*) Third, as for "Social Interaction," Dr. Andersen wrote: "Ms. Masterson has a longstanding history of conflicts with co-workers and supervisors. She reported that she was frequently on the verge of physical altercations with others; she once needed to be restrained by a co-worker from fighting with a supervisor. Irritability is a common symptom of depression (and she has bipolar II disorder which is marked by a depressive episode), but also, she has a longstanding history of abuse (including physical abuse), and her way of responding to conflict (e.g., fighting) may stem from her abusive past. She bathes on a regular basis and should be able to adhere to basic standards of neatness and cleanliness." (*Id.* at 1191.) Fourth, as for "Adapting to Change," Dr. Andersen wrote: "Ms. Masterson would likely

have significant difficulty responding appropriately to change in her work setting.  Change frequently bring stress and stress can exacerbate emotional symptoms and Ms. Masterson's emotional distress is also high.   She also has a tendency to become confrontational/aggressive in stressful situations (as evidence by her conflict with others at work) or will likely 'give up' and not perform tasks due to her depression.  Otherwise, she can likely recognize normal hazards."  (*Id.*)

> 3. <u>The ALJ's Evaluation Of Dr. Andersen's Opinions</u>

As noted, the ALJ deemed Dr. Andersen's opinions "partially persuasive."  (*Id.* at 29.)  The ALJ's full rationale was as follows:

> Dr. Andersen performed a consultative psychological evaluation on December 17, 2021 and diagnosed bipolar disorder, current or most recent episode depressed, and PTSD.   Dr. Andersen opined claimant could remember instructions but that she was likely prone to forgetfulness and making mistakes due to her pronounced emotional symptoms.  He indicated she would have difficulty maintaining concentration and initiating and completing tasks consistently without oversight due to her depression and emotional symptoms.  Dr. Andersen also said that, based on claimant's reports of difficulty with some supervisors and others in the past and considering her PTSD symptoms, she might have difficulty responding to conflict, but he noted she maintained good personal hygiene.  He also said she would likely have significant difficulty adapting to change appropriately due to limited stress tolerance, but that she could recognize normal hazards.
>
> [¶]  This opinion was partially persuasive based on its consistency with the medical evidence regarding claimant's mental impairments.  However, Dr. Andersen's functional assessment was vague and inconsistent with claimant's significant daily activities.  He stated that she was not capable of handling her own funds but claimant indicated in the record that she handled her own finances and bills independently.   Claimant has otherwise not exhibited "pronounced emotional symptoms" consistently in the record, as asserted by Dr. Andersen.   Claimant has shown depressive and other signs and symptoms in the record, but the evidence did not support any further limitations not outlined in the residual functional capacity evaluation adopted herein.  Dr. Andersen placed too much reliance upon the subjective reports of the claimant.  His conclusions were inconsistent with the claimant's score of 28 out of 30 in the mini mental status examination.  His conclusions were also inconsistent with the treatment records that characterized the claimant's psychological impairments as mild as well as the claimant's denial of anxiety

and depression.

(*Id.*, citations omitted.)

4. The Parties' Arguments

Plaintiff argues that the ALJ's evaluation of Dr. Andersen's opinions was flawed because (1) the ALJ "did not specify which parts of Dr. Andersen's assessment the ALJ thought were consistent with the evidence"; (2) the ALJ "did not cite to the record in support of" the conclusion that Dr. Andersen's findings were vague and inconsistent with Plaintiff's daily activities; (3) at any rate, Plaintiff's statements in her function report concerning her ability to pay bills were "not inconsistent with Dr. Andersen's opinion"; (4) the ALJ "did not explain which of [Plaintiff's] daily activities were inconsistent with what in Dr. Andersen's assessment," and at a minimum "failed to show . . . that a substantial part of a typical day was spent engaged in activities inconsistent with disabling limitations"; (5) the ALJ did not cite any material in the record to support the ALJ's determination that Plaintiff failed to consistently exhibit pronounced emotional symptoms, and in fact that conclusion was "inconsistent with a plain reading of [Plaintiff's] treatment records"; (6) the ALJ improperly found that Dr. Anderson placed too much reliance on Plaintiff's subjective reports, because Dr. Anderson found her reports to be credible and the Ninth Circuit has held that psychiatrists may rely on credible subjective reports; (7) the ALJ placed undue reliance on the results of the MMSE, even though the "findings during such a limited examination . . . [d]o not account for the overall severity of [Plaintiff's] condition" and only measure cognitive impairment, not affective impairment; (8) the ALJ provided an imprecise "citation to entire exhibits with hundreds of pages of records" in an attempt to show that Dr. Anderson's findings were inconsistent with Plaintiff's treatment records; and (9) the ALJ improperly found a conflict between Dr. Andersen's opinions and Plaintiff's denial of anxiety and depression during two treatment visits, because those visits were only for rheumatology. (Doc. 13 at 12-17.)

In response, the Commissioner defends the sufficiency of the ALJ's rationale for

discrediting Dr. Andersen's opinions.  (Doc. 17 at 7-13.)  First, the Commissioner argues that the ALJ permissibly discredited Dr. Andersen's opinions pursuant to the supportability factor because (1) they were expressed in vague qualifiers such as "limited" or "fair" or "likely"; (2) they were inconsistent with Dr. Andersen's notes and examination results; and (3) they were overly reliant on Plaintiff's subjective complaints.  (*Id.* at 8-10.)  Second, the Commissioner argues that the ALJ permissibly discredited Dr. Andersen's opinions pursuant to the consistency factor because (1) Dr. Anderson's opinion that Plaintiff was incapable of handling her own funds was inconsistent with Plaintiff's repeated statements that she was able to handle her own finances; and (2) Dr. Andersen's opinions were inconsistent with the treatment records describing Plaintiff's psychological impairments as mild.  (*Id.* at 10-13.)

In reply, Plaintiff accuses the Commissioner of improperly attempting to supply new *post hoc* rationales for discrediting Dr. Andersen's opinions; argues that the Commissioner's discussion of Plaintiff's ability to pay attention during the examination "omits important context"—namely, Dr. Andersen's observation that Plaintiff would be more prone to concentration problems in a more stressful environment; and argues that the Commissioner simply repeats certain of the ALJ's rationales without defending them. (Doc. 18 at 4-5.)

### 5.   Analysis

The ALJ's evaluation of Dr. Andersen's opinions was free of harmful error.  As noted, "[t]he agency must articulate how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings." *Woods*, 32 F.4th at 792 (cleaned up).  Here, the ALJ considered both factors in relation to Dr. Andersen.  (AR at 29.)

The ALJ's conclusion as to each factor was also supported by substantial evidence. One of the ALJ's proffered reasons for discounting Dr. Andersen's opinions pursuant to the supportability factor was that they were "inconsistent with [Plaintiff's] score of 28 out of 30 in the mini mental status examination."  (AR at 29.)  This conclusion was permissible.

As Dr. Andersen acknowledged, one purpose of an MMSE is to measure the patient's ability to sustain attention and concentration. (*Id.* at 1187 ["The mini-mental status exam . . . is used as a brief screening for orientation . . . [and] attention . . . ."].)[5]  Plaintiff scored a 28/30 on the MMSE and Dr. Anderson acknowledged that "[t]here was no evidence of attention/concentration problems during the exam," yet Dr. Andersen still concluded that Plaintiff's "attention/concentration will likely be fleeting in conjunction with her emotional symptoms." (*Id.* at 1190.)  It was rational for the ALJ to conclude that Dr. Andersen's opinion regarding Plaintiff's inability to sustain attention and concentration[6] was not supported by his examination results and clinical observations. *Cf. Waldram v. Kijakazi*, 2023 WL 8433769, *1 (9th Cir. 2023) ("Dr. Cavenee found that Waldram had a moderate limitation on . . . persisting in tasks by following short and simple instructions.  But Dr. Cavenee's exam showed that Waldram's . . . concentration . . . [was] within normal limits.  Moreover, Waldram scored a 30/30 on a 'mental status' exam . . . .  Therefore, substantial evidence supports the ALJ's determination that the relevant objective medical evidence from Dr. Cavenee's examination did not support his proposed mental limitations.").

The Court acknowledges that Dr. Andersen sought to explain why he believed the MMSE results and his clinical observations were not a good proxy for Plaintiff's ability to sustain attention and concentration in a work environment. (AR at 1190 ["There was no evidence of attention/concentration problems during the exam; however, the psychological exam took place in a relaxed, relatively distraction-free environment.  In a stressful or distracting environment, she is prone to concentration problems."].)  But under the

---

[5]      *See generally Carter v. Kijakazi*, 2023 WL 2967429, *8 n.14 (W.D. Va. 2023) ("The MMSE is an 11-question measure that tests seven areas of cognitive function: orientation, registration, attention and calculation, recall, language and visual construction.  The maximum score is 30.  A score of 24 or more is indicative of no cognitive impairment.").

[6]      Plaintiff's contention that the ALJ did not actually discount Dr. Andersen's opinions on this basis, which Plaintiff characterizes as a *post hoc* rationalization offered by the Commissioner (Doc. 18 at 4), is unavailing.  The ALJ specifically stated that Plaintiff's "score of 28 out of 30 in the mini mental status examination" was "inconsistent" with Dr. Andersen's "conclusions," which the ALJ summarized a few sentences earlier as including the opinion that Plaintiff "would have difficulty maintaining concentration and initiating and completing tasks consistently without oversight due to her depression and emotional symptoms."  (AR at 29.)

applicable standard of review, the Court is not tasked with deciding whether it agrees with Dr. Andersen's explanation.  Instead, the limited question is whether it was rational for the ALJ to find Dr. Andersen's explanation unpersuasive due to a lack of support in Dr. Andersen's testing results and clinical observations: "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas*, 278 F.3d at 954.  *See also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ."). It was rational for the ALJ to reach that conclusion here.  *See, e.g., Lacy v. Comm'r of Soc. Sec. Admin.*, 2023 WL 2624459, *7 (D. Ariz. 2023) ("Plaintiff also argues that her MMSE result does not 'invalidate Dr. Nolan's assessment' because her ability to successfully complete an MMSE may not be transferable to a work setting, and therefore does not necessarily demonstrate that she can complete tasks in the context of regular employment. This argument misses the mark."); *Scott P. v. Kijakazi*, 2022 WL 2047694, *8 (D. Idaho 2022) ("[I]t was not unreasonable for the ALJ to reject Dr. Sarff's medical opinion on the basis that the mental status exam did not clearly reveal 'intermittent severe impairment' in the areas of concentration, ability to interact with co-workers and supervisors, and mood."); *Benear v. Comm'r of Soc. Sec. Admin.*, 2019 WL 258345, *7 n.6 (D. Ariz. 2019) (rejecting claimant's argument that "the ALJ's reliance on Plaintiff's mini mental status examination is inappropriate because an MMSE . . . does not demonstrate a lack of concentration deficits due to depression and anxiety" and noting that "MMSEs are consistently used to evaluate the concentration, persistence, and pace of claimants' mental impairments") (cleaned up).[7]

Turning to the consistency factor, the ALJ concluded, *inter alia*, that Dr. Andersen's opinion that Plaintiff "was not capable of handling her own funds" was inconsistent with the evidence that Plaintiff "indicated . . . that she handled her own finances and bills independently."  (AR at 29.)  This conclusion is supported by substantial evidence.  In the

---

[7]     Given this conclusion, it is unnecessary to resolve Plaintiff's challenges to the ALJ's other proffered reasons for discounting Dr. Andersen's opinions pursuant to the supportability factor.

"Capability" section of his report, Dr. Anderson wrote that Plaintiff "is not capable of handling awarded benefits in a responsible manner that would be in her best interest" in part because "she lacks task initiation, and I would be concerned with her ability to pay bills on-time . . . and the organizational aspect of managing her finances." (*Id.* at 1189.) However, in her function report, Plaintiff checked boxes indicating that she is able to pay her bills, count change, handle a savings account, and use a checkbook/money order. (*Id.* at 341.)   Additionally, Plaintiff "denie[d] difficulties with . . . managing her finances" during an array of medical appointments. (*See, e.g., id.* at 1385, 1719, 1774.)   It was rational for the ALJ to conclude that these statements were inconsistent with Dr. Andersen's opinion regarding Plaintiff's ability to manage her finances.[8]

B.   **Dr. Higgins**

1.   Standard Of Review

The ALJ's evaluation of Dr. Higgins's opinions is subject to the same standard of review, set forth in Part IV.A.1 above, that governs the ALJ's evaluation of Dr. Andersen's opinions.

2.   Dr. Higgins's Opinions

In the fall of 2022, Dr. Higgins interviewed Plaintiff, conducted various tests, and then issued a report entitled "Neuropsychological Evaluation." (AR at 2263-68.)   Dr. Higgins also attached various reports and testing data to the evaluation. (*Id.* at 2269-96.)

As relevant here, in paragraph 13 of the evaluation form, Dr. Higgins provided the following assessment of Plaintiff's functional capabilities:

> Based on the results of this evaluation, Ms. Masterson would experience significant difficulty completing basic tasks associated with typical job duties, as well as complex tasks (i.e., those found in a typical work setting). From a neurocognitive perspective, based on her performance on neuropsychological tests, one would expect her to experience significant difficulty in a work setting.   She would experience significant difficulty learning new skills and completing key tasks typical of a work setting.   Her

---

[8]   Given this conclusion, it is unnecessary to resolve Plaintiff's challenges to the ALJ's other proffered reasons for discounting Dr. Andersen's opinions pursuant to the consistency factor.

ability to learn new information is impaired when it is presented via a visual information modality.  Many job skills are taught using this modality.  At this time, she experiences significant difficulty across many neurocognitive domains.  From a neurocognitive perspective, one would expect her to experience significant difficulty gaining or maintaining employment. Specifically, her attention deficits, memory impairments, speech difficulties, low intellectual functioning, and her severely impaired executive functioning/higher order cognitive processing deficits/frontal lobe dysfunction all contribute to her impaired neurocognitive status.  Her neuropsychological condition is disabling at this time.

(*Id.* at 2266-67, emphases omitted.)

### 3.  The ALJ's Evaluation of Dr. Higgins's Opinions

As noted, the ALJ deemed Dr. Higgins's opinions "otherwise minimally persuasive." (*Id.* at 30-31.)  The ALJ's full rationale was as follows:

Dane Higgins, Ph.D., completed an independent neuropsychological evaluation on October 11, 2022 and diagnosed ADHD, mild cognitive impairment, mixed receptive-expressive language disorder, post-concussion syndrome, generalized anxiety disorder, major depressive disorder, borderline intellectual functioning, personal history of traumatic brain injury and PTSD.  The assessment was performed to assess claimant's neurocognitive and psychological functioning, to assist with determining the severity of any attention, memory or other neurocognitive deficits, weight emotional factors, and aid with treatment planning.  Dr. Higgins stated claimant's full-scale IQ score of 74 placed her in the borderline intellectual functioning range, or in the moderately impaired range of intellectual functioning.

[¶]  Claimant's performance on neuropsychological testing was otherwise within normal limits across most neurocognitive domains, despite Dr. Higgins' assessment of a mild cognitive impairment.  The record supported mental impairments of anxiety, depression and PTSD, but it did not support severe neurocognitive disorders or ongoing post-concussive syndrome. Claimant otherwise had only mild limitations in understand and memory and she has demonstrated mostly normal mental status signs and obtained two normal results on mini mental status examinations.  The IQ score was inconsistent with the claimant's long-term employment as a phlebotomist, a semi-skilled position.  The neurologist office that made referral only interpreted the report of Dr. Higgins to support a mild neurocognitive impairment.  The one-time nature of the exam was limited and too much

reliance was place upon the subjective history of the claimant.  It is of interest that the claimant's neurologist, Arora Yessshumo, M.D., never entertained a diagnosis of post-concussion syndrome.   Dr. Higgin[s]'s opinion was otherwise minimally persuasive based on its inconsistencies with the medical evidence and claimant's reported and observed levels of functioning. Claimant's daily activities, including driving anywhere she needed to go, shopping, paying bills and managing her finances, and taking care of her children was inconsistent with borderline intellectual functioning or significant cognitive limitations endorsed by Dr. Higgins.

(*Id.* at 30-31, citations omitted.)

### 4.   The Parties' Arguments

Plaintiff argues that the ALJ's evaluation of Dr. Higgins's opinions was flawed because (1) the ALJ improperly relied "on his own medical perceived medical expertise" when finding that Dr. Higgins's opinions regarding Plaintiff's cognitive impairment were inconsistent with Dr. Higgins's neuropsychological testing results; (2) the ALJ failed to provide precise record citations in support of his determination that Dr. Higgins's diagnoses of severe neurocognitive disorders and ongoing post-concussive syndrome were inconsistent with the other medical evidence in the record; (3) the ALJ failed to provide an adequate explanation for his determination that Plaintiff's past semi-skilled work as a phlebotomist was inconsistent with Dr. Higgins's determination that Plaintiff had an IQ of 74; (4) the ALJ improperly discounted Dr. Higgins's opinions based on the one-time nature of the examination and Dr. Higgins's reliance on Plaintiff's subjective reports; (5) the ALJ improperly found a conflict between Dr. Higgins's diagnosis of post-concussive syndrome and the failure of a different medical provider, Dr. Arora, to diagnose the same syndrome; (6) the ALJ did not adequately explain or support his determination that Dr. Higgins's opinions were inconsistent with the record and Plaintiff's "reported and observed levels of functioning"; and (7) the ALJ did not adequately explain or support his determination that Dr. Higgins's opinions were inconsistent with Plaintiff's activities of daily living.  (Doc. 13 at 17-21.)

In response, the Commissioner argues that the ALJ permissibly discredited Dr.

Higgins's opinions because (1) "Dr. Higgins alone assessed Plaintiff with severe neurocognitive disorders and ongoing post-concessive syndrome" whereas "Plaintiff's neurologist 'never entertained a diagnoses of post-concussion syndrome'" and was unable to "reach a diagnosis of a neurogenerative disease"; (2) Dr. Higgins's opinions were inconsistent with the "normal results on two MMSEs, and mental status examinations that revealed mostly normal mental status signs"; and (3) Dr. Higgins's opinions were inconsistent with a consultative examiner's observation in August 2022 that Plaintiff was "bright and lucid" and able to "easily answer" questions.  (Doc. 17 at 13-15.)  The Commissioner also disputes Plaintiff's contention that the ALJ applied his own medical expertise and argues in conclusory fashion that "the ALJ reasonably reviewed the medical evidence for supportability and consistency, according to the new regulations." (*Id.* at 15-16.)

In reply, Plaintiff begins by arguing as follows: "Notably, the Commissioner repeats the ALJ's unsupported assumption that [Plaintiff's] treating neurologist 'never entertained a diagnosis of post-concussion syndrome.'  How the ALJ and Commissioner could possibly know what the treating neurologist entertained or did not entertain, regardless of what is posited in the medical records, is unexplained.  Why the Commissioner defends this reasoning—when [Plaintiff's] treating neurologist obviously entertained that something was awry with [Plaintiff's] cognitive abilities, or he would not have referred [Plaintiff] for an in-depth neuropsychological evaluation—is a mystery.  This is not a rational or reasonable reason to reject Dr. Higgins's assessment of [Plaintiff's] limitations." (Doc. 18 at 5.)  In a related vein, Plaintiff argues that "[t]he Commissioner's statement that 'Dr. Higgins alone assessed Plaintiff with severe neurocognitive disorders and ongoing post-concussive syndrome' makes sense, when Dr. Higgins was the only medical provider in this record who evaluated [Plaintiff's] cognitive impairment with a battery of tests and an in-depth neuropsychological evaluation; indeed, obtaining this information was the reason Dr. Arora sent [Plaintiff] to Dr. Higgins." (*Id.* at 5-6.)  Finally, Plaintiff accuses the Commissioner of improperly attempting to supply new *post hoc* rationales; argues that

1  those new rationales do not, in any event, establish any inconsistency; and argues that the

2  Commissioner simply repeats certain of the ALJ's rationales without defending them.  (*Id.*

3  at 5.)

4           5.    <u>Analysis</u>

5           As an initial matter, although the ALJ provided an array of reasons for discrediting

6  Dr. Higgins's opinions, the Commissioner only defends a handful of those reasons on

7  appeal.  As discussed above, the Court construes the answering brief as identifying three

8  reasons why the ALJ's evaluation of Dr. Higgins's opinions should be affirmed: (1) the

9  ALJ permissibly found an inconsistency between Dr. Higgins's opinions and the opinions

10  of Plaintiff's neurologist, Dr. Arora; (2) the ALJ permissibly found an inconsistency

11  between Dr. Higgins's opinions and the MMSEs and status examinations administered by

12  other medical providers; and (3) the ALJ permissibly found an inconsistency between Dr.

13  Higgins's opinions and another medical provider's observations of Plaintiff's level of

14  functioning.  (Doc. 17 at 14-15.)  Notably absent from that list is any defense of the ALJ's

15  evaluation of the supportability factor.  Thus, the Commissioner has forfeited any defense

16  of the ALJ's supportability analysis.[9]

17           Turning to the consistency factor, the Commissioner first seeks to defend the ALJ's

18  finding that Dr. Higgins's opinions were inconsistent with the opinions and diagnoses

19  offered by Plaintiff's neurologist, Dr. Arora.  (Doc. 17 at 14-15.)  The Court agrees with

20  Plaintiff that this portion of the ALJ's consistency analysis did not provide a valid basis for

21  discrediting Dr. Higgins's opinions.  It would be one thing if Dr. Higgins and Dr. Arora

22  had both sought to test Plaintiff for the same condition and then reached differing

23  conclusions as to its presence or severity—in that scenario, the conflict between the two

24  ───────────────

[9]      The Court construes the ALJ's decision as identifying one reason why Dr. Higgins's
25  opinions should be discredited pursuant to the supportability factor—because Dr.
Higgins's determination that Plaintiff was "in the borderline intellectual functioning range,
26  or in the moderately impaired range of intellectual functioning," lacked support in the
"neuropsychological testing" that Dr. Higgins performed, which showed that Plaintiff "was
27  otherwise within normal limits across most neurocognitive domains."   (AR at 31.)
Although Plaintiff explicitly challenges this analysis in her opening brief (Doc. 13 at 17-
28  18), the Commissioner does not specifically address or defend this analysis in the
answering brief.

opinions could provide a valid basis for discounting one opinion pursuant to the consistency factor. *See generally* 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) . . . is with the evidence from other medical sources . . . the more persuasive the medical opinion(s) . . . will be."). But that is not what occurred here. Although the ALJ wrote that "the claimant's neurologist, [Dr. Arora], never entertained a diagnosis of post-concussion syndrome" (AR at 31), the medical record cited by the ALJ ("B23F," which appears at AR 1702-1800) does not, at least as far as the Court can tell, contain any indication that Dr. Arora even attempted to evaluate Plaintiff for post-concussion syndrome, let alone considered and then rejected such a diagnosis. Moreover, Dr. Arora referred Plaintiff to Dr. Higgins so that Dr. Higgins could "assess [Plaintiff's] current level of neurocognitive and psychological functioning" and "assist with determining the severity of her attention, memory, and other neurocognitive deficits." (*Id.* at 2263.) On this record, the purported conflict between the opinions of Dr. Arora and Dr. Higgins—where the conflict arose only because Dr. Arora made a referral to Dr. Higgins for the purpose of performing more comprehensive testing in an attempt to diagnose additional conditions—does not provide a basis for discrediting Dr. Higgins.

The Commissioner next seeks to defend the ALJ's finding that Dr. Higgins's opinions were inconsistent with the MMSEs and status examinations administered by other medical providers. (Doc. 17 at 15.) Although such a conflict could provide a basis for discrediting an opinion pursuant to the consistency factor, the problem here is that the ALJ did not adequately explain why he perceived a conflict. *Woods*, 32 F.4th at 792 ("Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."). The situation here is unlike the situation with Dr. Andersen, where the ALJ specifically identified the portion of Dr. Andersen's opinion that he found to be unsupported by Dr. Andersen's MMSE results. In Dr. Higgins's case, although the ALJ noted that Plaintiff "had only mild limitations in understand[ing] and memory and . . . demonstrated mostly normal mental status signs and obtained two normal results on mini

mental status examinations" (AR at 32), Dr. Higgins similarly acknowledged that Plaintiff exhibited many normal signs of understanding, memory, and mental status during his examination—among other things, he stated that Plaintiff's "range of . . . affect was full and appropriate"; that Plaintiff's "verbal skills function well"; that Plaintiff "was alert, exhibited good attention and comprehension, and was fully cooperative"; that Plaintiff's "performance on neuropsychological measures was within normal limits across most neurocognitive domains"; and that Plaintiff's "performance placed her within normal limits, in the average range of functioning (i.e., from the 26th to 74th percentiles) on measures of mental status and orientation, visual color naming, visual matrix reasoning, visual discriminant attention, sustained visual attention, impulsivity to visual information, perseverative responding to visual information, and reaction time to visual information, visual attentional flexibility, immediate recall of auditory/verbal information, delayed recall of auditory/verbal information, and recognition memory of auditory/verbal information." (AR at 2264, 2266, 2268.) Under these circumstances, it was incumbent on the ALJ to explain, with specificity, why he perceived the MMSEs and status examinations administered by other providers to be inconsistent with Dr. Higgins's fairly nuanced opinions. The Court does not foreclose the possibility that the ALJ could have permissibly found such a conflict on this record, but the lack of a sufficiently detailed explanation precludes affirmance. *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) ("[T]he ALJ must provide sufficient reasoning that allows us to perform our own review, because the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (cleaned up).

The final portion of the ALJ's consistency analysis that the Commissioner seeks to defend is the ALJ's finding that Dr. Higgins's opinions were inconsistent with Plaintiff's "observed levels of functioning." (AR at 31.) According to the Commissioner, the observation to which the ALJ was referring was a report by consultative examiner Dr. Hauke, who described Plaintiff as "bright and lucid" and able to "easily answer" questions. (Doc. 17 at 15, citing AR at 1921.) This argument fails for two reasons. First, the ALJ did

not identify Dr. Hauke's report as providing the foundation for the "observed levels of functioning" conclusion.  In fact, this sentence of the opinion is not supported by any citation to the record.  The Commissioner cannot fill this void by citing evidence the ALJ did not cite.  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). Second, even assuming the ALJ intended to base the finding of inconsistency on Dr. Hauke's description of Plaintiff as "bright and lucid" and able to "easily answer" questions, it is not clear why the ALJ viewed that description as inconsistent with Dr. Higgins's opinions.  As noted, although Dr. Higgins found that Plaintiff was severely impaired in certain respects, Dr. Higgins also noted that she "was alert, exhibited good attention and comprehension, and was fully cooperative" during his examination and that her "verbal skills function well."  (AR at 2268.)  As before, although the Court does not foreclose the possibility that the ALJ could have permissibly found a conflict between Dr. Hauke's and Dr. Higgins's observations of Plaintiff's levels of functioning, the problem lies in the lack of a sufficiently detailed explanation.  *Lambert*, 980 F.3d at 1277.

      C.     **PA-C Albertson**

           1.     <u>Standard Of Review</u>

The ALJ's evaluation of PA-C Albertson's opinions is subject to the same standard of review, set forth in Part IV.A.1 above, that governs the ALJ's evaluation of Dr. Andersen's opinions.

           2.     <u>PA-C Albertson's Opinions</u>

On June 8, 2021, PA-C Albertson completed a two-page checkbox form entitled "Medical Assessment of Ability to Do Work-Related Physical Activities."  (AR at 820-21.)  In the form, PA-C Albertson checked boxes indicating, *inter alia*, that Plaintiff would be able to sit for less than 2 hours in an 8-hour workday; would be able to stand/walk for less than 2 hours in an 8-hour workday; would be able to lift less than 10 pounds; would

be able to carry less than 10 pounds; would need to alternate between sitting, standing, and walking every 1-20 minutes; would need to rest every 15+ minutes; would be able to use each hand, bend, reach, and stoop on a "less than occasional" basis; had cognitive or pace limitations that would cause her to experience "severe" interruptions of work pace; and would need to miss 6+ days of work per month due to her medical conditions.  (*Id.*)

### 3.   The ALJ's Evaluation of PA-C Albertson's Opinions

As noted, the ALJ deemed PA-C Albertson's opinions "unpersuasive."  (*Id.* at 28.) The ALJ's full rationale was as follows:

> Michael Albertson, PA-C, completed a functional assessment on June 8, 2021 finding claimant limited to less than sedentary work activity, and that claimant would likely miss more than six days of work per month due to her impairments. This opinion was unpersuasive based on its inconsistency with the greater record and with claimant's reported and observed levels of functioning.  The record did not support Mr. Albertson's assertion that claimant could less than occasionally use her hands or perform postural maneuvers such as stooping.  This statement was inconsistent with the claimant's denials of hand pain, weakness, numbness, and tingling.  There was also inadequate support for the assertion that claimant's cognitive limitations precluded simple work activity or the ability to sustain regular work pace.  Mr. Albertson was completely unqualified to render any opinion as to the vocational implications of a mental impairment.  As a PA-C, his opinions were far less persuasive than those of a physician with far greater education and experience.  In addition, progress notes from this source dated May 17, 2021 showed normal general exam findings with no neurological deficits and normal mental status.

(*Id.*, citations omitted.)

### 4.   The Parties' Arguments

Plaintiff argues that the ALJ's evaluation of PA-C Albertson's opinions was flawed because (1) in some instances, the ALJ merely provided vague references to the greater record; (2) although the ALJ stated that PA-C Albertson's opinions regarding Plaintiff's hand limitations were contradicted by certain medical records, the cross-referenced records actually show that Plaintiff either complained about hand symptoms or was silent on the topic; (3) the ALJ's determination that PA-C Albertson was unqualified to opine on

Plaintiff's mental impairments was based on a misapprehension of PA-C Albertson's opinions, which merely sought to assess the effect of Plaintiff's chronic pain on her ability to sustain work; (4) more broadly, the ALJ's decision to discredit PA-C Albertson's opinions based on his status as a physician's assistant is contrary to the new regulations; and (5) the ALJ provided insufficient reasons for crediting the opinions of certain other medical providers. (Doc. 13 at 21-24.)

In response, the Commissioner argues that the ALJ permissibly discredited PA-C Albertson's opinions because (1) PA-C Albertson "did not provide any narrative explanation to support the opined limitations he identified"; and (2) PA-C Albertson's finding of hand-related limitations was inconsistent with treatment notes from other providers reflecting an absence of observable hand-related symptoms. (Doc. 17 at 16-18.) The Commissioner also briefly addresses, and defends, the ALJ's reasoning for accepting the opinions of certain other medical sources. (*Id.* at 18-19.)

In reply, Plaintiff argues that because the ALJ did not identify the lack of a narrative explanation as a basis for discrediting PA-C Albertson's opinions, the Commissioner may not offer that rationale for the first time on appeal; reiterates that the treatment notes cited by the ALJ are not inconsistent with PA-C Albertson's opinions; and reiterates that the ALJ's analysis as to the other providers was insufficient. (Doc. 18 at 6-7.)

          5.   <u>Analysis</u>

The ALJ expressly considered the supportability and consistency factors when evaluating PA-C Albertson's opinions, as required by the new regulations. (AR at 28.) Additionally, the Court agrees with the Commissioner that the ALJ provided a legally sufficient reason for discounting PA-C Albertson's opinions pursuant to the consistency factor. Although PA-C Albertson opined that Plaintiff would be able to perform "less than occasional" activities with either hand (AR at 820), the ALJ correctly noted that there were multiple instances in which, although Plaintiff complained of hand pain during medical appointments, the medical provider was ultimately unable to find any objective evidence of a hand-related impairment. (*Id.* at 1867 ["Left Wrist—No tenderness, swelling,

effusion, or limitation to range of motion.  Hands—No tenderness, swelling, effusion, or limitation to range of motion."]; *id.* at 1896 ["Moves all 4 extremities, No joint swelling. No pedal edema. No arthritis seen on both hands."]; *id.* at 2299 ["Negative" for "Extremity weakness, Headache, Numbness in extremity and Tingling]; *id.* at 2300 ["Hands—No tenderness, swelling, effusion, or limitation to range of motion."].)  Although Plaintiff identifies reasons why the ALJ could have viewed these records as reconcilable with PA-C Albertson's opinions regarding her hand limitations, it was rational for the ALJ to make a finding of inconsistency.  And as noted elsewhere in this order, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas*, 278 F.3d at 954.

On the other hand, although the ALJ provided two reasons for discounting PA-C Albertson's opinions pursuant to the supportability factor—first, because PA-C Albertson was "completely unqualified to render any opinion as to the vocational implications of a mental impairment" due to a lack of the "greater education and experience" possessed by a physician; and second, because "progress notes from this source dated May 17, 2021 showed normal general exam findings with no neurological deficits and normal mental status" (AR at 28)—the Commissioner does not defend either of those reasons in the answering brief.  Instead, the Commissioner seems to argue that the ALJ properly discredited PA-C Albertson's opinions pursuant to the supportability factor because "Albertson did not offer any narrative explanation or comments to support the opined limitations he identified, nor did he specify which impairments gave rise to his restrictive opinion. . . .  In the absence of any narrative explanation . . . in Mr. Albertson's opinion, the ALJ appropriately looked to Plaintiff's treatment notes to assess the supportability and consistency of his opinion."  (Doc. 17 at 16-17.)  The problem with this approach is that although the lack of a narrative explanation could have been a permissible reason to discount PA-C Albertson's opinions pursuant to the supportability factor, *Weiss v. Kijakazi*, 2023 WL 4030839, *1 (9th Cir. 2023) (concluding that the ALJ "reasonably found . . . unpersuasive" certain "opinions [that] were in check-box form and were not

accompanied by explanation or narrative"), the ALJ did not provide that reason in the underlying decision and the Court must limit its review to the ALJ's proffered reasons. *Bray*, 554 F.3d at 1225.

This conclusion, however, does not mean that Plaintiff is entitled to reversal with respect to her challenge to the ALJ's evaluation of PA-C Albertson's opinions.  The Ninth Circuit has stated that any error in an ALJ's supportability analysis is harmless if the ALJ also provided a legally sufficient reason for discrediting a medical source's opinion pursuant to the consistency factor.  *Woods*, 32 F.4th at 793 n.4 (suggesting that even if an opinion is supported, an ALJ may properly find it unpersuasive pursuant to the consistency factor); *Palmer v. O'Malley*, 2024 WL 1904347, *1 (9th Cir. 2024) ("[T]he ALJ's conclusion that Dr. Young and Dr. Koss-Leland's opinions are inconsistent with the [medical evidence] is supported by substantial evidence.  Accordingly, to the extent the ALJ erred by failing to clearly articulate how she considered the supportability factor, any such error was harmless.").  That is the situation here.

D.  **Remedy**

Plaintiff asks the Court to apply the "credit-as-true" rule, which would result in the remand of her case for the limited purpose of calculating benefits.  (Doc. 13 at 24-25.)

"The credit-as-true analysis has evolved in our circuit over time, thus providing a challenge for application by the district court."  *Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017).  As the Ninth Circuit has clarified in recent opinions, "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule."  *Id.  See also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 n.5 (9th Cir. 2014) ("[O]ur jurisprudence . . . requires remand for further proceedings in all but the rarest cases.").

"The credit-as-true rule has three steps.  First, we ask whether the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.  Second, we determine whether the record has been fully developed, whether there are outstanding issues that must be resolved before a determination of

disability can be made, and whether further administrative proceedings would be useful. And third, if no outstanding issues remain and further proceedings would not be useful, only then do we have discretion to find the relevant testimony credible as a matter of law. Even if all three steps are met, the decision whether to remand a case for additional evidence or simply to award benefits is in our discretion." *Washington v. Kijakazi*, 72 F.4th 1029, 1041 (9th Cir. 2023) (cleaned up).  A district court properly exercises its discretion to remand for further proceedings where "there is serious doubt as to whether [the claimant] is disabled." *Leon*, 880 F.3d at 1048.  *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) ("[E]ven if all three requirements are met, we retain flexibility in determining the appropriate remedy.  We may remand on an open record for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.") (cleaned up).

The credit-as-true rule is inapplicable here.  Although step one is satisfied in light of the ALJ's failure to provide legally sufficient reasons for discrediting the opinions of Dr. Higgins, step two is not—further administrative proceedings would be useful to enable the ALJ to address the analytical deficiencies discussed above, including why the ALJ viewed Dr. Higgins's opinions as lacking support in Dr. Higgins's own testing, why the ALJ viewed Dr. Higgins's opinions as inconsistent with the MMSEs and status examinations administered by other medical providers, and why the ALJ viewed Dr. Higgins's opinions as inconsistent with Plaintiff's observed levels of functioning.

Alternatively, even if step two were satisfied, the Court would decline in its discretion to order a remand for benefits under step three because the record as a whole creates serious doubt as to whether Plaintiff is, in fact, disabled.  As discussed, the ALJ discredited Plaintiff's symptom testimony (a decision Plaintiff does not challenge on appeal), permissibly discredited the opinions of some medical sources who attempted to opine to disabling limitations, and accepted the opinions of other medical sources who opined to less restrictive limitations.  *See, e.g., Leon*, 880 F.3d at 1048 ("[W]e remand on an open record because there is serious doubt as to whether Leon is in fact disabled, given

that the district court upheld the ALJ's other findings."); *Burrell v. Colvin*, 775 F.3d 1133, 1141-42 (9th Cir. 2014) (rejecting the claimant's argument that "because the ALJ's reasons for discrediting her testimony and Dr. Riley's assessment are legally insufficient, we have no choice but to . . . remand for an award of benefits" and concluding that a remand for further proceedings was the appropriate remedy because, even though "Claimant may be disabled," "evidence in this record not discussed by the ALJ" cast serious doubt on the claim of disability).

Accordingly,

**IT IS ORDERED** that the decision of the ALJ is **reversed**.  This matter is **remanded** for further proceedings.  The Clerk shall enter judgment accordingly and terminate this action.

Dated this 19th day of September, 2024.

_____
Dominic W. Lanza
United States District Judge